UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 17-2885-cmm

UNITED STATES OF AMERICA

vs.

LUIS GUSTAVO MORENO RIVERA and
LEONARDO LUIS PINILLA GOMEZ,

    Defendants.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003?   _____ Yes   __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?   _____ Yes   __X__ No

Respectfully submitted,

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY

By: _____
JUAN A. GONZALEZ, JR.
Assistant United States Attorney
Florida Bar No. 0897388
11200 NW 20th Street, Suite 101
Miami, Florida 33172
Tel: (305) 715-7640 / 7653
Fax: (305) 715-7639
Email: Juan.Antonio.Gonzalez@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br><br>Luis Gustavo Moreno Rivera and<br>Leonardo Luis Pinilla Gomez,<br><br>*Defendant(s)* | )<br>)<br>) Case No. 17-2885-CMM<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __May of 2017 to the present__ in the county of __Miami-Dade__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1956(h) | Conspiracy to commit money laundering |

This criminal complaint is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Yasmany Cepero, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: JUNE 23, 2017

_____
*Judge's signature*

City and state: Miami, Florida

Chris M. McAliley, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

Your affiant, Yasmany Cepero (the "affiant"), first being duly sworn, states as follows:

I am a Special Agent with the Drug Enforcement Administration (DEA) and have been employed in such capacity since 2011. As such, I am an investigative and law enforcement officer of the United States empowered by law to conduct investigations of and make arrests for offenses enumerated in the United States Code. I am currently assigned to the Miami Field Division. Since joining the DEA, I have personally participated in numerous investigations of federal laws to include narcotics, money laundering, wire fraud, and racketeering violations.

I make this affidavit based on my own personal knowledge, as well as information provided to me by other law enforcement officers and civilians. Because this affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint charging Luis Gustavo Moreno Rivera (Moreno) and Leonardo Luis Pinilla Gomez (Pinilla) with Conspiracy to Commit Money Laundering, in violation of Title 18, United States Code, Section 1956(h), it does not contain all the facts known to me concerning this investigation.

This investigation involved the use of a cooperating source of information (the CS). The CS was a practicing attorney in the country of Colombia, South America prior to becoming the Governor for the region of Cordoba in Colombia. The CS no longer holds this position. Throughout this investigation, the information provided by the CS has proven to be reliable. I have been able to corroborate much of the CS's information, often through recorded communications between the CS, Moreno and Pinilla.

During the CS's tenure as Governor, he became the target of a corruption investigation spearheaded by the Attorney General (AG) of Colombia.[1]  Consistent with

---

[1] The CS, through his Colombian attorney, has been in discussions with the Colombian AG to

Colombian law, the CS, if charged, would be prosecuted by a delegate of the AG because of his position as a Governor. His co-conspirators, however, are being investigated and prosecuted by the office of Anti-Corruption for the Attorney General's Office of Colombia. The Director of this Office is Moreno. The evidence gathered by Moreno's office and the witnesses developed during his investigation would form the crux of the AG's prosecution against the CS.

Pinilla is an attorney practicing in Colombia, South America. He, Moreno and the CS were acquaintances through their work as litigating attorneys prior to the CS becoming a Governor and Moreno assuming his current position.

The CS reported that sometime in November 2016, in Colombia, Pinilla approached the CS with a message from Moreno indicating that Moreno was willing to use his official position to obstruct the corruption investigation against the CS in exchange for a fee. The CS further stated that sometime in February or March 2017, Moreno and Pinilla went to the CS's apartment in Colombia where Moreno, in an effort to entice a bribe from the CS, disclosed to the CS that three of the CS's co-defendants had been granted immunity to testify against the CS. Moreno disclosed the identity of two of the three cooperators. Moreno offered to continue providing the CS with confidential information related to the criminal case against him (the CS) by way of Pinilla in order to assist the CS in developing a defense strategy to defeat the charges against him.

Sometime after this meeting, Pinilla contacted the CS on behalf of Moreno and asked the CS for a bribe in the amount of 100 million Colombian pesos (approximately $34,500 US) in exchange for copies of sworn statements taken from cooperators that had testified against the CS.

---

plead guilty to Colombian corruption charges and cooperate against his co-conspirators.

Subsequent to this, on April 26, 2017, the CS and his family traveled to Miami in order to facilitate the CS's wife's high-risk pregnancy. Since April 26, 2017, he (the CS) has remained in Miami.

After his arrival in Miami, the CS, through his Colombian attorney, contacted the Colombian AG and the DEA regarding Moreno and Pinilla. At the direction of law enforcement and with the concurrence of the Colombia AG, the CS continued his conversations with Pinilla. These conversations, which were primarily via encrypted cell phone messaging services, were captured and recorded by the DEA.

On May 26, 2017, shortly after Pinilla traveled to Miami to meet with the CS, a controlled, recorded meeting with Pinilla occurred at the Dolphin Mall in Doral, Florida. DEA investigators conducted surveillance during the duration of this meeting and equipped the CS with audio recording devices. In addition, surveillance photographs were taken of the CS and Pinilla as they conducted the meeting. During the meeting, Pinilla referenced the initial meeting he had with the CS and Moreno at the CS's apartment in Colombia and confirmed that he and Moreno may still be willing to help the CS, but that he (Pinilla) would have to contact Moreno to confirm because the CS had not paid them (Moreno and Pinilla) any money yet. Pinilla added that Moreno thought the case against the CS was getting stronger and that the CS's arrest was imminent. Pinilla added that Moreno would arrange everything and pay whoever needed to be paid to take care of the CS's legal troubles, but that he (Moreno) needed confirmation from the CS that he was serious about continuing the negotiations.

Pinilla added that the ideal strategy would be to find ways to discredit the witnesses who are testifying against the CS and added that he (Pinilla) had utilized that same strategy and other

strategies successfully during other acts of corruption that he and Moreno had perpetrated in the past. Pinilla further confirmed that Moreno wanted to be paid for his services through Pinilla.

After the aforementioned meeting in Doral, Florida, the CS and Pinilla continued to communicate via encrypted messages whereby Pinilla would relay messages to the CS from Moreno about continuing the negotiations.

On June 15, 2017, Moreno travelled to Miami, Florida to give an anti-corruption presentation to the Internal Revenue Service (IRS). Prior to this, Pinilla told the CS that he (Pinilla) would also travel to Miami on the same date. Pinilla told the CS that Moreno wanted to take advantage of his official trip to meet with the CS to further the bribery negotiations.

On June 15, 2017, the CS conducted a controlled, recorded meeting with Pinilla and Moreno in the vicinity of the La Quinta Inn in Doral, Florida. DEA agents conducted visual surveillance throughout the duration of this meeting and equipped the CS with audio recording devices. In addition, a surveillance photograph was taken of Pinilla and Moreno as they conducted the meeting. During the meeting, which was held in the CS's car at various locations in the vicinity of the La Quinta Inn, Moreno told the CS that he had the power to judicially control how the CS's investigation would proceed. Moreno disclosed to the CS that additional allegations of fraud committed by the CS had been referred to his (Moreno's) office for investigation. Moreno indicated these allegations involved a bribe of 300 million pesos purportedly received by the CS. Moreno stated that witnesses had testified the CS had sent delegates to collect this bribe money. Moreno identified one of these witnesses by name.

During the conversation, Moreno indicated that the prosecutor assigned to the CS's case intended to charge the "Happy Lora Coliseum" investigation and the "Puente Valencia" investigation. Moreno provided the name of one of the witnesses in the "Happy Lora Coliseum"

4

investigation and stated that the witness testified about irregularities in billing related to that project. Moreno then asked Pinilla to take the CS's cell phones from him and place them on the hood of the vehicle so that they can continue to speak inside the vehicle without fear of being recorded. Once this was done, Moreno disclosed the prosecution's theory and strategy to the CS and added that the CS could use the information he (Moreno) provided to prepare his (the CS's) defense. The CS attempted to discuss payment of the bribe to Moreno, but Moreno insisted he (the CS) discuss the issue with Pinilla, which, according to the CS, Moreno communicated nonverbally with hand gestures. Pinilla asked Moreno to tell the CS what Moreno had been told related to the CS's cooperation. Moreno indicated that a high level official within the Colombian government had told Moreno that the CS was cooperating with federal authorities in the United States.[2]

At one point during the meeting, after the cell phones had been placed on the hood of the car, the car was moved and the cell phones fell off the hood. Moreno became agitated and demanded that the CS's phones be found because of the incriminating information (encrypted communications) they contain. Shortly after this, Moreno discovered an additional cell phone the CS had secreted within the vehicle. Moreno accused the CS of recording the conversation and began to contradict himself stating he was not asking for money and that he was sharing information with the CS because he wanted to avoid an injustice in the CS's case.

Shortly thereafter, Moreno ended the conversation and was dropped off at the La Quinta Inn. Before departing, Pinilla met with Moreno in private, away from the CS. Once Moreno left, Pinilla told the CS that Moreno was upset because the CS brought up the bribe payment directly

---

[2] Based on the limited number of people with knowledge of this fact and Moreno and Pinilla's subsequent actions, I do not believe Moreno was actually aware of the investigation. Rather, I believe he said this to see how the CS would react.

with him and that he insisted that the bribe payments be discussed with Pinilla as an intermediary. Pinilla told the CS that he (Pinilla) excused the CS's actions to Moreno by telling him that he (Pinilla) had authorized the CS to speak about the bribe payment directly with Moreno as long as he (the CS) used coded language such as "los documentos" (the documents) to refer to the money. Pinilla added that Moreno was concerned about the discovery of the hidden cell phone and that Moreno had a lot to lose. Pinilla then added that Moreno wanted the CS to pay him a bribe in the sum of $20,000 while he (Moreno) was in Miami but that the $20,000 sum is separate from the 400 million Colombian pesos (the equivalent of approximately $132,000 US) Moreno was charging for the assistance he is providing the CS. The CS agreed, but insisted he wanted confirmation that the money was, in fact, being given to Moreno. Pinilla then confirmed that he and the CS would deliver the money to Moreno the following day.

On June 16, 2017, the DEA photographed and serialized $10,000 of official funds and placed the funds in a large yellow manila envelope (the funds envelope). The funds envelope was provided to the CS in anticipation of his meeting with Pinilla and Moreno later that day. On the same date, the CS conducted a controlled, recorded meeting with Pinilla and Moreno at the Dolphin Mall in Doral, Florida. DEA investigators conducted surveillance during the duration of this meeting and equipped the CS with audio recording devices. In addition, surveillance photographs were taken of the CS, Pinilla and Moreno as they conducted the meeting.

The CS and Pinilla drove to the meeting together. Prior to Moreno's arrival, the CS told Pinilla that all his funds were located here in the US. Pinilla then stated that Moreno wanted a total of $40,000 delivered to him while he (Moreno) was still in Miami. The CS then reiterated that all of his funds were in the US and that they (Pinilla and Moreno) needed to instruct him on how they wanted it delivered to Colombia. Pinilla further indicated that he expected Moreno to

provide him with confidential information related to the CS's case in the following week and encouraged the CS to pay him (Moreno) half the requested amount by then.

Pinilla instructed the CS that he (Pinilla) would meet Moreno in the mall within sight of the CS. Pinilla and Moreno would walk to the bathroom where Piniella would give the funds envelope to Moreno. The CS was to walk behind them into the bathroom where Moreno would acknowledge receipt of the money.

Agents observed Pinilla as he walked through the Dolphin Mall while holding the funds envelope. He met with Moreno and both walked to the bathroom with the CS following. Immediately after entering the bathroom Pinilla and Moreno walked out with Pinilla still holding the funds envelope. They then indicated to the CS he should go to the car.[3]

All three men — Moreno, Pinilla and the CS — walked out of the Dolphin Mall and entered the CS's vehicle. At the time, Pinilla was still in possession of the funds envelope. While in the vehicle, the CS, Pinilla, and Moreno engaged in conversation. During the conversation, Moreno told the CS that it is not convenient for him to continue meeting the CS in person and that it is not necessary for him (Moreno) to be present in subsequent meetings between the CS and Pinilla. He added the CS should understand that any agreement made by Pinilla has been ratified by him (Moreno). Moreno then stated that everything else (relating to the bribe payment) could be done by way of Pinilla. Moreno then added that he intends to saturate the prosecutors that work under him with a great deal of unrelated casework to distract them from engaging in the CS's case.

Once Moreno got out of the vehicle with Pinilla, surveillance observed that the funds envelope was now in the possession of Moreno. After a brief conversation, Moreno and Pinilla

---

[3] Agents later learned the plan was changed because there were too many people in the bathroom.

7

parted ways and Moreno was observed walking back to the mall entrance while holding the funds envelope.

Once Pinilla returned to the vehicle, his conversation with the CS continued. During this conversation, Pinilla informed the CS that because of the delay in paying Moreno, Moreno had leaked confidential information to the Colombian press to damage the CS's reputation.[4] Pinilla further stated that Moreno was satisfied with the money that he and the CS had delivered to him and added that Moreno was expecting an additional $30,000 delivered to him the following day. The CS then drove Pinilla to the airport for his (Pinilla's) flight back to Colombia.

On June 17, 2017, the following day, Pinilla sent the CS a screenshot of an encrypted WhatsApp conversation between himself (Pinilla) and Moreno in which Moreno asked about the status of the delivery of the rest of the funds from the CS. Pinilla responded in the message to Moreno that he had instructed the CS to obtain the funds for him (Moreno). Pinilla continued to urge the CS to provide the money to Moreno but the CS, at the direction of law enforcement, continued to delay the payment in spite of Moreno extending his stay in Miami an additional day. The last communication between Pinilla and the CS where the CS was being urged to pay the remaining money was Sunday, June 18, 2017, at 3:30 pm. Moreno left Miami the following afternoon.

When Moreno left, a cursory outbound search was conducted by Customs and Boarder Protection Officers (CBP) of Moreno and his wife, Carolina Rico-Rodriguez (Rico), on the jet bridge at the Miami International Airport (MIA) just before the departure of their flight from

---

[4] It should be noted that shortly before Moreno's arrival, the CS was contacted by a reporter from the Miami Herald seeking an interview. The interview never took place and yesterday, June 22, 2017, the Miami Herald published a story concerning the CS.

8

Miami to Bogota, Colombia.[5]  During the interview and search, CBP officers found and photographed currency that was in the possession of both Moreno and Rico.  A deposit receipt for a Chase bank account in the amount of $1,000, dated June 18, 2017, was found in Rico's possession.  Rico was also in possession of three $100 bills which contained serial numbers matching the official funds provided by DEA to the CS in the funds envelope for delivery to Moreno.  Additionally, Moreno was in possession of one $100 bill which contained serial numbers matching the official funds given to the CS.  The currency was photographed by CBP and returned to Moreno and Rico, who then proceeded to board their flight.  During the encounter with CBP, Rico indicated that while in Miami, she purchased Bulgari earrings and a bracelet.

On June 20, 2017, the CS sent Pinilla a WhatsApp message indicating he (the CS) had the rest of the money for Moreno with him in Miami.  The CS asked Pinilla to ask Moreno what Moreno wanted him (the CS) to do with it.  Pinilla immediately answered that Moreno needed the money in Colombia.  The CS replied that he and his money were in Miami and that he (the CS) would not be traveling to Colombia.  Pinilla answered that he (Pinilla) would check with Moreno and get back to the CS.  To date, Pinilla has not responded with Moreno's instructions.

Based on the above, I believe there is probable cause to issue a complaint charging Moreno and Pinilla with conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h).  Specifically, Moreno and Pinilla knowingly combined, conspired, confederated, and agreed with each other to transport, transmit or transfer monetary instruments or funds from Miami to Colombia with the intent to promote the carrying on of a specified unlawful

---

[5] A full search was not conducted fearing Moreno would suspect he was under investigation.

activity, that is foreign bribery as listed in Title 18, United States Code, Section 1956(c)(7)(B)(iv). Importantly, the Colombian AG's Office has confirmed that Moreno's actions constitute bribery under Colombian law.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
Yasmany Cepero
Special Agent, DEA

SUBSCRIBED and SWORN to
before me this 23rd day of June, 2017.

_____
HONORABLE CHRIS M. MCALILEY
UNITED STATES MAGISTRATE JUDGE